*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-1562**

State of Minnesota,
Respondent,

vs.

Ernest Alvin Ranzy,
Appellant.

**Filed August 15, 2016
Affirmed
Jesson, Judge**

Hennepin County District Court
File No. 27-CR-15-2879

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael O. Freeman, Hennepin County Attorney, Linda M. Freyer, Assistant County Attorney, Minneapolis, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Jenna Yauch-Erickson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Jesson, Presiding Judge; Schellhas, Judge; and Hooten, Judge.

# U N P U B L I S H E D   O P I N I O N

**JESSON**, Judge

Appellant Ernest Ranzy challenges the sufficiency of the evidence to sustain his terroristic-threats convictions. Ranzy argues that there is no evidence that he

communicated a threat to commit a future crime of violence. Ranzy also raises several issues in a pro se supplemental brief. Because the evidence is sufficient to support Ranzy's convictions and we find no merit in the issues raised in his pro se brief, we affirm.

**FACTS**

On January 25, 2015, appellant Ernest Ranzy and his wife T.R. had an argument in their pick-up truck. During the argument, Ranzy hit T.R. in the eye.[1] When T.R. got out of the truck and refused to get back in, Ranzy drove away. T.R. flagged down a Metro Transit mobility vehicle for a ride. Ranzy started following the Metro Transit vehicle, and the driver called the police. Police drove T.R. to a shelter where she spent the night.

On the morning of January 26, T.R. went to work at the Medica building in Minnetonka. Ranzy called multiple times that morning, telling her to come home and saying that they could work things out. He also said that he was not going to live without her. Their last conversation was around noon. T.R. told Ranzy that the relationship was over. T.R. thought Ranzy seemed very angry during the call.

T.R. asked her co-worker T.B. to give her a ride back to the shelter after work. T.B. agreed, and they left work together that afternoon. As they walked through the Medica parking lot toward T.B.'s car, T.R. noticed Ranzy in the pick-up truck. Ranzy was in the driver's seat and was yelling out the window at T.R. to come with him. He was also saying that he was going to leave and not come back. When T.R. noticed

---

[1] T.R. testified that she was not sure if Ranzy punched her in the eye or if he threw a cellphone at her eye.

2

Ranzy, she and T.B. were almost to T.B.'s car. They hurried through the parking lot and got into the car.

Ranzy's truck was behind T.B.'s car so she could not reverse out of the parking spot. There was no car in the spot in front of her, however, so she pulled forward and to the right. T.B. then took another right toward one of the parking lot's exits. Ranzy drove the pick-up truck down the aisle of parking spots and blocked T.B. from completing her right turn and heading to the exit. A bystander heard the pick-up truck's "wheels screeching" as Ranzy sped through the parking lot to block T.B.'s exit. T.B.'s car was now wedged between the pick-up and a median, preventing her from going forward or in reverse. T.B. and T.R. were both very scared. T.R. was saying they had to go because Ranzy would kill them. T.B. was holding her hands up to try and show Ranzy she wanted no part of this conflict.

Ranzy got partially out of the pick-up. Ranzy continued to yell at T.R. to come with him. As Ranzy got out, the pick-up pulled forward slightly. T.B. believed that she could now get around the pick-up and started to drive forward. When T.B. pulled forward, Ranzy quickly got back in the pick-up truck, reversed, and then drove forward at a relatively high rate of speed into T.B.'s car. The bystander again described hearing "wheels screeching" as Ranzy drove towards and rammed into T.B.'s car. When the vehicles collided, T.B.'s car spun so that it was now facing the opposite direction.

After ramming T.B.'s car, Ranzy reversed a second time. T.B. thought that Ranzy was going to ram into her car again. She was also worried that if she got out of the car, Ranzy might run her over. But then Ranzy pulled the pick-up alongside the car to talk to

T.R.  Although the driver-side door was jammed from the collision, T.B. was able to kick it open.  She got out of the car and ran back into the Medica building.

Ranzy got out of the pick-up and began banging on the passenger-side window and yelling at T.R. about reconciling.  T.R. believed that Ranzy was trying to break the window.  She climbed over the driver's seat, exited, and also ran back into the Medica building.  Ranzy then got back into the pick-up truck and drove away.

Initially, Ranzy was charged with two counts of second-degree assault.  On the first day of trial, the state amended the complaint to add two counts of terroristic threats, one count for each victim.  After the state presented its case, Ranzy moved for a judgment of acquittal on all charges.  Ranzy's attorney argued that Ranzy did not threaten to commit a crime of violence and therefore could not be convicted of terroristic threats.  The district court denied the motion.

The jury found Ranzy guilty of both terroristic-threats counts.  The jury acquitted Ranzy of the two second-degree assault counts.  The district court sentenced Ranzy to 32 months in prison on one terroristic-threats count and 36 months in prison on the other.  The district court ordered the sentences served concurrently.  This appeal follows.

## DECISION

**I.    The evidence is sufficient to support the jury's finding that Ranzy threatened T.R. and T.B. with a future crime of violence and that he communicated the threat with the purpose of terrorizing the victims or in reckless disregard of the risk of causing such terror.**

Ranzy first claims that the evidence is insufficient to support his terroristic-threats convictions.  He argues that the state failed to prove that he threatened to commit a future

4

crime of violence. Ranzy maintains that the act of driving a pick-up at another vehicle may be an assault but cannot be construed as a threat to commit a future assault.

In considering a claim of insufficient evidence, we conduct a painstaking analysis of the record to determine if the evidence was sufficient to allow the jury to reach the verdict that it did. *State v. Ortega*, 813 N.W.2d 86, 100 (Minn. 2012). We view the evidence in the light most favorable to the verdict and assume that the jury believed the state's witnesses and disbelieved any contrary evidence. *State v. Fox*, 868 N.W.2d 206, 223 (Minn. 2015), *cert denied*, 136 S. Ct. 509 (2015). The verdict will not be disturbed if the jury, "acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offense[s]." *Ortega*, 813 N.W.2d at 100.

Any person who threatens, directly or indirectly, to commit a crime of violence with the purpose of terrorizing another or in reckless disregard of terrorizing another, is guilty of making a terroristic threat. Minn. Stat. § 609.713, subd. 1 (2014). A threat is defined as the communication of an intent to harm another or his property through an unlawful act. *State v. Schweppe*, 306 Minn. 395, 399, 237 N.W.2d 609, 613 (1975). The communication, when viewed in context, must have a "reasonable tendency to create apprehension that its originator will act according to its tenor." *Id.* (quotations omitted). The threat need not be verbal or written. *State v. Murphy*, 545 N.W.2d 909, 916 (Minn. 1996). Physical acts may communicate a threat. *Id.*

The threat, however, must be to commit a crime of violence in the *future*. *Id.* The statute is designed to deter and punish both the future act threatened and the threat itself.

5

*Id.* But there is no specific amount of time that must pass before a threat of immediate violence turns into a threat to commit future violence. *State v. Smith*, 825 N.W.2d 131, 136 (Minn. App. 2012), *review denied* (Minn. Mar. 19, 2013).

The jury was instructed that to find Ranzy guilty of both terroristic-threats counts they had to determine that he threatened T.R. and T.B. with second-degree assault. Second-degree assault requires the use of a dangerous weapon to commit an act "with intent to cause fear in another of immediate bodily harm or death" or "intentional[ly] inflicting" or "attempt[ing] to inflict bodily harm upon another." Minn. Stat. §§ 609.02, subd. 10, .222, subd. 1 (2014).

The state does not argue that Ranzy verbally threatened T.R. or T.B. Instead, when his actions are considered in context, the state argues that Ranzy's driving conduct conveyed a threat to use the pick-up to commit the crime of assault with a dangerous weapon. We agree.

The evidence shows that Ranzy assaulted T.R. on January 25. Then, on January 26, Ranzy called T.R. and told her that he would not live without her. He was angry because T.R. wanted to end the relationship. When T.R. and T.B. left work at the end of the day, Ranzy was waiting in the parking lot and began yelling at T.R. to come with him and to reconcile their relationship. When T.B. drove toward the exit, Ranzy raced through the parking lot and used his pick-up to physically prevent T.R. and T.B. from leaving.

When Ranzy's pick-up pulled forward slightly, T.B. thought she could drive around it and to the exit. As soon as she began pulling forward, Ranzy got back into his

6

truck and reversed. Ranzy appeared willing to do anything to prevent T.R. and T.B. from leaving. Given this context, a reasonable jury could find that, when Ranzy re-entered his pick-up and reversed, he communicated a threat to ram T.B.'s car if T.B. did not stop driving forward. Under these circumstances, it was reasonable to believe that Ranzy would follow through with this threat.

While the length of time between Ranzy reversing and Ranzy ramming T.B.'s car was very short, there is no specific amount of time that must pass before a threat of immediate violence turns into a threat of future violence. *Smith*, 825 N.W.2d at 136. In *Smith*, the defendant waved a knife in front of the victim and demanded money. *Id.* at 135. We held that, although this took place during an ongoing confrontation, the act of waving the knife in front of the victim communicated a threat to stab the victim in the future if the money was not delivered. *Id.* at 135-36. Smith's terroristic-threats conviction therefore punished and deterred both the threat to stab the victim and the act threatened. *Id.* at 136.

Similarly, when T.B. began to drive her car forward, Ranzy reversed. This communicated a threat that if T.B. did not stop her car, Ranzy would commit the future crime of second-degree assault by ramming T.B.'s car. Ranzy's terroristic-threats convictions therefore punish and deter the threat Ranzy communicated by reversing, as well as the threatened act of ramming T.B.'s car.

The state also argues that Ranzy threatened to commit a future second-degree assault when, after ramming T.B.'s car, he reversed again. We agree. T.B. testified that she was concerned that Ranzy was going to ram her car a second time. She also testified

7

that she considered getting out of the car but was initially worried that Ranzy would run her over if she exited. A reasonable jury could find that Ranzy's act of reversing, after running into T.B.'s car, communicated a threat to hit T.B.'s car a second time. Given the context, the jury could also find that it was reasonable to believe Ranzy would carry out this threat.

Furthermore, Ranzy banging on the passenger window with his hands could also be viewed by the jury as a threat to commit second-degree assault. T.R. testified that Ranzy was banging so hard on the window she believed he was trying to break it. Given what had previously occurred, Ranzy pounding on the window with that amount of force could be viewed as a threat to assault T.R. should Ranzy successfully break the window.

A threat to use hands as a dangerous weapon may be the basis of a terroristic-threats conviction, where the threatened crime of violence is second-degree assault. *State v. Jorgenson*, 758 N.W.2d 316, 322 (Minn. App. 2008). The defendant, however, must threaten to use his hands in a way that is calculated to or likely to produce great bodily harm or death. *Id.* By banging hard on the window after just ramming into T.B.'s car, Ranzy may have threatened to use his hands to commit an assault calculated to produce great bodily harm or death.

In addition to proving a threat to commit a future crime of violence, the state also had to prove that Ranzy communicated the threat with the purpose of terrorizing T.R. and T.B. or acted "in a reckless disregard of the risk of causing such terror." Minn. Stat. § 609.713, subd. 1. Under the terroristic-threats statute, "purpose means aim, objective, or intention," and "terrorize means to cause extreme fear by use of violence or threats."

8

*Smith*, 825 N.W.2d at 136 (quotation omitted). Intent is a state of mind that must generally be proven by using circumstantial evidence. *State v. Cooper*, 561 N.W.2d 175, 179 (Minn. 1997). A victim's reaction to a threat is circumstantial evidence of intent. *Schweppe*, 306 Minn. at 401, 237 N.W.2d at 614.

We apply heightened scrutiny to convictions that are based on circumstantial evidence. *State v. Al-Naseer*, 788 N.W.2d 469, 473 (Minn. 2010). In circumstantial evidence cases, the circumstances proved must be consistent with guilt and inconsistent with any other rational hypothesis. *State v. Hawes*, 801 N.W.2d 659, 668 (Minn. 2011). The first step in analyzing whether the evidence is sufficient is to identify the circumstances proved. *Id.* The second step, is to "examine independently the reasonableness of all inferences that might be drawn from the circumstances proved, including inferences consistent with rational hypotheses other than guilt." *Al-Naseer*, 788 N.W.2d at 473-74 (quotation omitted).

The circumstances proved, as outlined above, show that T.R. and T.B. were terrified by Ranzy coming to their workplace, physically blocking them from leaving the parking lot, running into T.B.'s vehicle, reversing, and then banging on the vehicle's passenger-side window. We conclude that the circumstances proved are inconsistent with any rational hypothesis other than guilt.[2]

---

[2] Ranzy also argues that we must remand and order the district court to hold a restitution hearing. At Ranzy's sentencing, the district court ordered restitution and Ranzy objected. The district court then agreed with a statement by the prosecutor that because written notice of the restitution amount had not yet been given, Ranzy should wait and request a hearing after the written restitution order had been filed. *See* Minn. Stat. § 611A.045, subd. 3(b) (2014) ("An offender may challenge restitution, but must do so by requesting a

9

**II.    The issues raised in Ranzy's pro se supplemental brief are without merit.**

In his pro se supplemental brief, Ranzy claims that his trial attorney was ineffective, that his right to a speedy trial was violated, and that there was error in the jury instructions. We briefly address each claim below.

### A. *Ineffective Assistance of Counsel*

To prevail on a claim of ineffective assistance of counsel, Ranzy must demonstrate "(1) that his counsel's representation 'fell below an objective standard of reasonableness'; and (2) 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Nissalke v. State*, 861 N.W.2d 88, 94 (Minn. 2015) (quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S. Ct. 2052, 2064, 2068 (1984)). An attorney provides reasonable assistance when the attorney exercises the customary skills and diligence that a reasonably competent attorney would exercise under the circumstances. *Dukes v. State*, 621 N.W.2d 246, 252 (Minn. 2001). The defendant must overcome the "strong presumption that counsel's performance fell within a wide range of reasonable assistance." *Gail v. State*, 732 N.W.2d 243, 248 (Minn. 2007). Matters of trial strategy

---

hearing within 30 days of receiving written notification of the amount of restitution requested, or within 30 days of sentencing, whichever is later."). The prosecutor and the district court both indicated that they would consider any subsequent request for a restitution hearing timely. Ranzy conceded at oral argument that he has not requested a restitution hearing since the written restitution order was filed. Appellate courts typically do not consider matters that were not argued to and considered by the district court. *Roby v. State*, 547 N.W.2d 354, 357 (Minn. 1996). Because Ranzy has not requested a restitution hearing since sentencing, the district court has not considered the issue, and there is nothing for us to review. We do not address the matter.

are left to the discretion of trial counsel and are not second-guessed on appeal. *Leake v. State*, 737 N.W.2d 531, 536 (Minn. 2007).

Ranzy first claims that his attorney was unprepared on the original trial date, and, as a result, the state had additional time to amend the complaint to add the terroristic-threats charges. On the date trial was scheduled to begin, Ranzy insisted that his public defender was not prepared and demanded a new attorney. The attorney, however, indicated that he was prepared to proceed with trial. The district court explained to Ranzy that he would not be granted a different public defender, but Ranzy persisted in his demands. Ultimately the district court continued the matter to allow Ranzy additional time to consult with his attorney. The trial was therefore continued at Ranzy's request. Furthermore, even if the continuance was granted because the attorney needed additional time to prepare for trial, it is unclear how successfully obtaining a continuance to further prepare a defense could amount to a failure to provide reasonable assistance. Moreover, Ranzy has failed to show prejudice. Although the new charges were added on the continued trial date, Ranzy provides no evidence that the additional charges would not have been filed had the trial commenced as originally scheduled.

Second, Ranzy argues that his attorney failed to file "standard motions in preparation for trial." But Ranzy does not identify the motions that he believes his attorney should have filed or state how he was prejudiced by his attorney's failure to file these motions.

Ranzy further argues that his attorney failed to communicate with him about trial strategy. Trial strategy, however, is left to the discretion of trial counsel and is generally

11

not reviewed by this court. *Leake*, 737 N.W.2d at 536. Ranzy also does not indicate how this failure to communicate prejudiced him. He fails to state anything that would have been done differently had his attorney been in better communication.

Ranzy also maintains that his attorney failed to provide him with discovery, jury instructions, or clothes for trial. These claims are all plainly contradicted by the record.

Lastly, Ranzy claims that his attorney failed to object to the addition of the new terroristic-threats charges. It is unclear if this refers to a failure to object to the state amending the complaint, a failure to challenge probable cause, or both. Regardless, Ranzy cannot prevail because his attorney's performance was not deficient, and, even if it had been deficient, Ranzy suffered no prejudice. Under Minn. R. Crim. P. 3.04, subd. 2, prior to the jury being sworn, the prosecuting attorney may freely amend the complaint by motion. *State v. Bluhm*, 460 N.W.2d 22, 24 (Minn. 1990). The state moved to amend the complaint before the jury was sworn. Accordingly, there was likely no basis to challenge the district court's decision to grant the amendment. There was also no basis for a probable-cause challenge. This is clear from the district court's denial of Ranzy's motion for a judgment of acquittal and our conclusion that there was sufficient evidence to support Ranzy's convictions on these charges. *See, e.g.*, *Dobbins v. State*, 788 N.W.2d 719, 731 (Minn. 2010) (noting that burden of overturning grand jury indictment is heavier after a fair trial and a jury finding of guilt beyond a reasonable doubt).

Ranzy's attorney competently argued pre-trial and jury-instruction issues, thoroughly cross-examined witnesses, competently presented Ranzy's testimony, and presented a thorough closing argument. The attorney's representation led to an acquittal

on the more serious second-degree assault charges. Ranzy has not shown that his attorney's assistance fell below an objective standard of reasonableness or that he was prejudiced by his attorney's alleged errors. *See Nissalke*, 861 N.W.2d at 94.

### B. Speedy Trial

Ranzy next argues that the district court violated his right to a speedy trial by allowing the state to amend the complaint to add the two terroristic-threats charges. He claims that the amendment violated his right to a speedy trial because it was made one day after his 60-day speedy-trial date.

Ranzy's trial began on May 5, 2015. Ranzy made a speedy trial demand on March 5, 2015. Ranzy's trial therefore began on the 61st day after his speedy-trial demand. A delay of more than 60 days from the date of the speedy-trial demand raises a presumption that a violation has occurred. *State v. Taylor*, 869 N.W.2d 1, 19 (Minn. 2015); *see also* Minn. R. Crim. P. 11.09 (stating that "the trial must start within 60 days" of a speedy-trial demand "unless the court finds good cause for a later trial date"). However, "[w]hen the overall delay in bringing a case to trial is the result of the defendant's actions, there is no speedy trial violation." *State v. DeRosier*, 695 N.W.2d 97, 109 (Minn. 2005). The delay was the result of Ranzy's actions and can in no way be attributed to the state. Ranzy's trial was originally scheduled for April 27, 2015, well within the 60 days. Although the state appeared to have been ready for trial and Ranzy's attorney said he was also ready for trial, Ranzy insisted that his attorney was not prepared and demanded a new attorney. Ranzy's actions forced the district court to continue the

13

matter. The state's subsequent motion to amend the complaint caused no further delay. Ranzy's right to a speedy trial was not violated.

### C. *Jury Instructions*

Finally, Ranzy raises a general challenge to the jury instructions. He does not point to any specific instruction, but alleges generally that the instructions confused the jury and were not in line with the law. A claim of error in a brief based only on assertion and not supported by argument or authority is forfeited unless prejudicial error is clear on inspection. *State v. Wembley*, 712 N.W.2d 783, 795 (Minn. App. 2006), *aff'd*, 728 N.W.2d 2443 (Minn. 2007). We observe no obvious prejudicial error in the jury instructions.[3]

**Affirmed.**

---

[3] Ranzy's pro se brief also raises what he labels a "[v]iolation of due process." This section, however, only addresses a sufficiency-of-the-evidence claim that appears identical to that argued in Ranzy's principal brief.